# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

ANTON SARIC and GRACE SARIC,    )
    )
    Plaintiff,    )
    )    FILED: JUNE 16, 2008
    )
    v.    )    Case No. 08CV3459
    )    JUDGE MAROVICH
BANKUNITED FSB,    )    MAGISTRATE JUDGE NOLAN
    )    Judge:  TG
    Defendants.    )    Magistrate:
    )

---

## COMPLAINT

NOW COME the Plaintiffs, ANTON SARIC and GRACE SARIC, by and through their attorneys, Matton & Grossman, PC, and complain against Defendant, BANKUNITED, FSB and in support thereof state as follows:

### I. PRELIMINARY STATEMENT

1.    This Complaint is filed under the Truth in Lending Act, 15 U.S.C. § 1601 (hereinafter referred to as "TILA") to enforce the plaintiff's right to rescind a consumer credit transaction, to void the Defendant's security interest in the Plaintiffs' residence located at 121 West Cobblestone Drive, Crete, IL 60417, and to recover statutory damages, reasonable attorney's fees and costs by reason of the Defendant's violations of the Act and Regulation Z, 12 CFR, § 226 (hereinafter referred to as "Regulation Z").

## II. JURISDICTION

2.      Jurisdiction is conferred on this Court by 15 U.S.C. § 1640(e) and 28 U.S.C. §§ 1331, 1337. The Court has authority to issue declaratory judgment by virtue of 28 U.S.C. § 2201.

3.      This Court has supplemental jurisdiction over the Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

## III. PARTIES

4.      The Plaintiffs, ANTON SARIC and GRACE SARIC, (hereinafter referred to as "PLAINTIFFS" or the "SARICS"), are natural persons, currently residing at 121 West Cobbleston Drive, Crete, Illinois 60417.

5.      Defendant BANKUNITED FSB is a federally chartered savings bank engaged in the business of consumer banking and mortgage finance in the State of Illinois.

6.      Defendant BANKUNITED FSB has its principal place of business located at 7815 N.W. 148th Street, Miami Lakes, Florida 33016.

7.      Based on information and belief, at all times relevant hereto, Defendant, BANKUNITED FSB, in the ordinary course of business, regularly extended or offered to extend consumer credit to consumers for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four (4) installments.

## IV. FACTUAL ALLEGATIONS

8.      On or about June 15, 2006, Plaintiffs, the SARICS, entered into a consumer credit transaction (hereinafter "the Transaction") with Defendant BANKUNITED FSB in which the

extended consumer credit was subject to a finance charge and which was initially payable to Defendant, BANKUNITED FSB.

9.      A true and accurate copy of the credit agreement evidencing the transaction is attached hereto marked as Exhibit A, and by this reference is incorporated herein.

10.     As part of the consumer credit transaction, Defendant, BANK UNITED FEDERAL SAVINGS BANK, attempted to retain a security interest in 121 West Cobblestone Drive, Crete, Illinois 60417 which is used as the principal dwelling of the SARICS.

11.     The security interest was not created to finance the acquisition or initial construction of the SARICS' dwelling.

12.     A true and accurate copy of the mortgage evidencing Defendant, BANK UNITED FEDERAL SAVINGS BANK's security interest is attached hereto, marked as EXHIBIT B, and by this reference is incorporated herein.

V.  FIRST CAUSE OF ACTION

13.     This consumer credit transaction was subject to the Plaintiffs, SARICS', right of rescission as described by 15 U.S.C.  § 1635 and Regulation Z § 226.23 (12 C.F.R. § 226.23).

14.     In the course of this consumer credit transaction, Defendant, BANK UNITED FEDERAL SAVINGS BANK, violated 15 U.S.C. § 1635(a) and Regulation Z § 226.23(b) by failing to deliver to the Plaintiffs two (2) copies each of a notice of the right to rescind which:

        A.      Identified the transaction;

        B.      Clearly and conspicuously disclosed the security interest in the Plaintiffs' principal dwelling;

3

    C.      Clearly and conspicuously disclosed the Plaintiffs' right to rescind the transaction; and

    D.      Clearly and conspicuously disclosed the date the rescission period expired.

15.    In the course of this consumer credit transaction, Defendant, BANKUNITED FSB, failed to deliver to the SARICS all "material" disclosures required by the Act and Regulation Z including the following:

    A.      By failing to properly and accurately disclose the "amount financed," using that term in violation of Regulation Z § 226.18(b) and 15 U.S.C. § 1638(a)(2)(A).

    B.      By failing to properly and accurately disclose the "finance charge," using that term, in violation of Regulation Z §§ 226.4 and 22618(d) and 15 U.S.C. § 1638(a)(3).

    C.      By failing to clearly and accurately disclose the "annual percentage rate," using that term, in violation of Regulation Z § 226.18(e) and 15 U.S.C. § 1638(a)(4).

    D.      By failing to properly disclose the number, amounts, and timing of payments scheduled to repay the obligation, in violation of Regulation Z § 226.18(g) and 15 U.S.C. § 1638(a)(6).

    E.      By failing to properly and accurately disclose the "total of payments," using that term, in violation of Regulation Z § 226.18(h) and 15 U.S.C. § 1638(a)(5).

16.    By reason of the aforementioned material violations delineated in Paragraphs 15 and 16 above,  pursuant to 15 U.S.C § 1635(f), the SARICS have a right of rescission for three (3) years from the date of the consummation of the loan which was June 15, 2006.

17.    On January 15, 2008 the SARICS rescinded the transaction by sending a notice of rescission to the Defendant BANKUNITED FSB at 1900 East Golf Road, Suite 1200, Schaumburg, Illinois 60173, by U.S. Mail, postage prepaid, certified mail, return receipt requested.

18.    A true and accurate copy of that notice of rescission is attached hereto, marked EXHIBIT C, and by this reference is incorporated herein.

19.    The notice of rescission was received by BANKUNITED FSB on or about January 17, 2008, and a copy of the return receipt evidencing such is attached hereto as Exhibit "D".

20.    More than twenty (20) calender days have passed since the Defendant BANKUNITED FSB received SARICS notice of rescission.

21.    The Defendant, BANKUNITED FSB, has failed to take any action necessary or appropriate to reflect the termination of any security interest described in paragraphs 11 and 13 above, as required by 15 U.S.C. § 1635(b) and Regulation Z § 226.23(d)(2).

22.    The Defendant, BANKUNITED FSB, has failed to return to the SARICS any money or property given by SARICS to anyone, as required by 15 U.S.C. § 1635(b) and Regulation Z § 226.23(d)(2).

23.    As a result of the aforesaid violations of the Act and Regulation Z, pursuant to 15 U.S.C. §§ 135(a), 1640(a) and 1641(c), Defendant, BANKUNITED FSB, is liable to the SARICS for:

      A.    Rescission of this transaction;

B.    Termination of any security interest in the SARICS' property created under the transaction;

C.    Return of any money or property given by the SARICS to anyone in connection with this transaction;

D.    Statutory damages of $2,000.00 for each of the disclosure violations;

E.    Statutory damages of $2,000.00 for Defendant's failure to respond properly to Plaintiffs' rescission notice.

F.    Forfeiture of return of loan proceeds;

G.    Actual damages in an amount to be determined at trial; and

H.    Reasonable attorney fees as permitted by 12 U.S.C. §§ 1635, 1640.

## VI. PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, ANTON SARIC and GRACE SARIC, pray that this Court enter an Order for her and against defendant, BANKUNITED FSB, that states as follows:

1.    It assumes and takes jurisdiction in this case;

2.    It declares null and void any and all security interest, allegedly held by the Defendant, BANKUNITED FSB, in the Plaintiffs' residence, located at 121 West Cobblestone Drive, Crete, Illinois 60417;

3.    The transaction of June 15, 2006, is rescinded;

4.    Defendant must take all action necessary to terminate any security interest in Plaintiffs' property created under this transaction and that the Court declare all such security

interests void, including but not limited to the mortgage related to the transaction of June 15, 2006.

5.     Defendant must return to the Plaintiffs any money or property given by the Plaintiffs to anyone in connection with the transaction;

6.     Defendant during the pendency of this action, is enjoined from instituting, prosecuting, or maintaining foreclosure proceedings on the Plaintiffs' property, from recording any deeds or mortgages regarding the property or from otherwise taking any steps to deprive Plaintiffs of ownership of that property.

7.     Defendant during the pendency of this action, is enjoined from instituting, prosecuting, maintaining or reporting to any default, deficiency or otherwise adverse or negative reporting to any credit bureau, credit agency or any of their affiliates, which communication by the Defendant may have a negative impact on the credit scores of ANTON SARIC and GRACE SARIC;

8.     For an award to the Plaintiffs, ANTON SARIC and GRACE SARIC and against Defendant for statutory damages as a result of the disclosure violations, in the amount of twice the finance charge in connection with this transaction, but not less than $200.00 or more than $2,000.00 as provided under 15 U.S.C. § 1640(a).

9.     For an award to the Plaintiffs, ANTON SARIC and GRACE SARIC, and against Defendant, BANKUNITED FSB, for statutory damages as a result of Defendant's failure to respond properly to the Plaintiffs' rescission notice, in the amount of twice the finance charge in connection with this transaction but not less than $200.00 or more than $2,000.00 as provided under 15 U.S.C. § 1640(a).

10.    As a result of the Defendant's failing to respond to Plaintiffs' notice of rescission, the

Plaintiffs, ANTON SARIC and GRACE SARIC, have no duty to tender, but in the

alternative, if tender is required, the Court will determine the amount of the tender

obligation in light of all of Plaintiffs' claims, and order the Defendant to accept said

tender on reasonable terms and over a reasonable period of time;

11.    For an award of damages in an amount to be determined at the trial of this matter;

12.    For an award of costs and attorney's fees to Plaintiffs, ANTON SARIC and GRACE

SARIC, as provided under 15 U.S.C § 1640(a); and

13.    For any and all other relief this Court deems just and proper.


Respectfully submitted,

Douglas M. Matton


Douglas M. Matton
Matton & Grossman, PC
Attorneys for Plaintiffs
200 W. Madison Street
Suite 710
Chicago, IL  60606
(312)236-9800
ARDC No.:  6225571

# EXHIBIT A

# BankUnited

## Adjustable Rate Rider
### (1 Year MTA Index – Initial Discounted Monthly Payment –
### Payment Caps and Maximum Rate)
### (1 Month MTA ARM)

THIS ADJUSTABLE RATE RIDER is made this **15th** day of **June 2006**
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note, as modified or amended (the "Note") to **BankUnited, FSB**

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**121 WEST COBBLESTONE DRIVE
CRETE, IL 60417**

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT, AND THE PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES MAY BE LIMITED. BOTH MY MAXIMUM INTEREST RATE AND MINIMUM INTEREST RATE ARE LIMITED. MY INITIAL REQUIRED MONTHLY PAYMENT AMOUNT WILL NOT BE SUFFICIENT TO PAY THE INTEREST THAT ACCRUES UNDER THE NOTE. THE PRINCIPAL BALANCE OF THE NOTE MAY INCREASE TO AN AMOUNT THAT IS LARGER THAN THE AMOUNT THAT I ORIGINALLY BORROWED.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for changes in the interest rate and the monthly payments, as follows:

**"2.    INTEREST**
**(A) Interest Rate**
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **7.7500** %. The interest rate I will pay will change as provided in this Section 2.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.
**(B) Interest Change Dates**
The interest rate I will pay may change on the first day of **August 2006** and on that same day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date".
**(C) Interest Rate Limits**
My interest rate will never be greater than **9.9500** %. My interest rate will never be less than the amount of the then applicable Margin described in Section 2(E) below.
**(D) Index**
Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the Twelve Month Average of the monthly yields (the "Monthly Yields") on actively traded United States Treasury securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Statistical Release entitled "Selected Interest Rates (H.15)." The Twelve-onth Average is determined by adding together the Monthly Yields for the most recently available twelve months, dividing that sum by 12, and then rounding the resulting number to four decimal places. The most recent Index figure available as of the date 15 days before each Interest Change Date is called the "Current Index."
If the Index, or any substitute Index, is no longer available, the Note Holder will choose a new Index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**
Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **Three and 4400/10000** percentage points ( **3.4400** %) (the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one-percentage point (0.125%). Subject to the limits stated in Section 2(C) above, the rounded amount will be my new interest rate, which will become effective on the Interest Change Date. That interest rate will remain in effect until the next Interest Change Date.
In the event a new Index is selected in accordance with Section 2(D) above, a new Margin may be established. The new Index and Margin will result in an interest rate that is substantially similar to the interest rate that was in effect at the time that the old Index became unavailable.

Multistate Adjustable Rate Rider – 1 Year MTA Index – Initial Discounted Monthly Payment – Payment Caps and Maximum Rate – Monthly Rate Change

Page 1 of 3    Initials: _____

MFCD5084    000495153-9

**(A) Time and Place of Payments**

I will make my monthly payments on the first day of every month, beginning on **August 2006** . I will make a payment every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **July 1, 2036** , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make monthly payments at **7815 NW 148 ST., MIAMI LAKES, FL 33016**

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payment**

My initial monthly payment will be in the amount of U.S. $ **1,326.95** . My initial monthly payment was calculated using a rate of **1.7000** %, the original Principal, and the Maturity Date. This rate is lower than the initial interest rate stated in Section 2(A) above.

The amount of my initial monthly payment will change as provided in this Section 3.

**(C) Payment Change Dates**

My monthly payment will change as required by Section 3(D) below beginning on the due date of my thirteenth (13th) payment, which is due on **August 1, 2007** and on that same day every twelfth (12th) month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change as provided under Section 3(F) below.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date until the next Payment Change Date, unless my monthly payments are changed earlier as provided in Section 3(F) below.

**(D) Calculation of Monthly Payment Changes; Limitations**

On each Payment Change Date, my monthly payment will change to the amount that would be sufficient to repay the Principal that I am expected to owe at the Payment Change Date, together with interest at the rate in effect during the preceding month, in full in substantially equal monthly installments through the Maturity Date. However, unless Section 3(F) or Section 3(G) below apply, the amount of my new monthly payment, beginning on each Payment Change Date, will be limited to an amount that is no more than 7 1/2% greater than the amount I am required to pay under this Note immediately prior to that Payment Change Date. The Note Holder's monthly billing statement may disclose other payment options that I may have, if I should wish to pay a monthly payment that is larger than this amount.

**(E) Changes in My Unpaid Principal**

My initial required monthly payment amount will not be sufficient to pay the interest that will accrue under this Note at the initial interest rate stated in Section 2(A) of this Note, and may be lesser or greater than the amount sufficient to pay the interest that will accrue under this Note at the interest rates that thereafter are in effect under this Note. In addition, since my monthly payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 3(D) above, my subsequent monthly payments could be lesser or greater than the amount sufficient to pay the interest that will accrue under this Note at the interest rates that are in effect under this Note from time to time. For each month that my monthly payment is less than the interest that accrues under this Note, the Note Holder will subtract the monthly payment from the amount of the accrued interest and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate that is in effect under this Note from time to time. For each month that the monthly payment is greater than the interest that accrues under this Note, the Note Holder will apply the excess towards a Principal reduction of this Note.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to 115% of the Principal amount originally borrowed. In the event my unpaid Principal would otherwise exceed that 115% limitation on a monthly payment due date, I will begin paying a new monthly payment on that due date, and will continue to make this payment each month until the next Payment Change Date, subject at all times to a further increase in my monthly payment under this Section 3(F) if my unpaid Principal would again otherwise exceed the 115% limitation. The new monthly payment will be the amount that would be sufficient to repay my then unpaid Principal, together with interest at the rate in effect during the month prior to the payment due date, in full in substantially equal monthly installments through the Maturity Date. The new monthly payment will be determined without applying the 7 1/2% payment limitation described in Section 3(D) of this Note.

**(G) Required Full Monthly Payment**

On the 5th Payment Change Date, on each succeeding 5th Payment Change Date thereafter, and on the final Payment Change Date, the monthly payment will be determined without regard to the 7 1/2% payment limitation described in Section 3(D) of this Note.

**4.    NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me, and also the title and telephone number of a person who will answer any question I may have regarding the notice."

**B.    TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read, in its entirety, as follows:

**"Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed,

MFCD5084
Multistate Adjustable Rate Rider – 1 Year MTA Index – Initial Discounted Monthly Payment – Payment Caps and Maximum Rate –
Monthly Rate Change

000495153-9

Initials: _____

contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee, and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower."

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 3 of this Adjustable Rate Rider.

_____ (Seal)    _____ (Seal)
ANTON J. SARIC                -Borrower  GRACE A. SARIC              -Borrower


_____ (Seal)    _____ (Seal)
                              -Borrower                             -Borrower


_____ (Seal)    _____ (Seal)
                              -Borrower                             -Borrower


[Sign Original Only]

MFCD5084                                                      000495153-9

Multistate Adjustable Rate Rider – 1 Year MTA Index – Initial Discounted Monthly Payment – Payment Caps and Maximum Rate – Monthly Rate Change

Page 3 of 3                              Initials: _____

# EXHIBIT B

This instrument was prepared by:

Name: **SHANIN MATTHES**

Address:

**BANKUNITED, FSB**
**1900 E GOLF RD SUITE 1200 ,**
**SCHAUMBURG IL 60173**

After Recording Return To:
**BANKUNITED, FSB**
**ATTN: POST CLOSING**
**7815 NW 148 STREET**
**MIAMI LAKES, FL  33016**

————————————————————————— [Space Above This Line For Recording Data] —————————————————————————

# MORTGAGE

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)  "**Security Instrument**" means this document, which is dated **June 15, 2006**                          , together with all Riders to this document.

(B)  "**Borrower**" is **ANTON J SARIC and GRACE A SARIC, HUSBAND AND WIFE, IN JOINT TENANCY**

Borrower is the mortgagor under this Security Instrument.

(C)  "**Lender**" is **BankUnited, FSB**

Lender is a **CORPORATION**                                                                    organized and existing under the laws of **UNITED STATES OF AMERICA**                                                    . Lender's address is **7815 NW 148 STREET, MIAMI LAKES, Florida  33016**

. Lender is the mortgagee under this Security Instrument.

(D)  "**Note**" means the promissory note signed by Borrower and dated **June 15, 2006**                          . The Note states that Borrower owes Lender **Three Hundred Seventy Four Thousand and no/100**

Dollars (U.S. $ **374,000.00**                       ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **July 01, 2036**             .

(E)  "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

(F)  "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(G)  "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] Other(s) [specify] **LEGAL DESCRIPTION** |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | |

(H)  "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**ILLINOIS**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM 1876L1 (0011)                                         *(Page 1 of 11 pages)*

**Form 3014 1/01**
GREATLAND ■
To Order Call: 1-800-530-9393 ☐ Fax: 616-791-1131

MFIL3112                                                                                        000495153-9

**(I)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(J)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K)** **"Escrow Items"** means those items that are described in Section 3.

**(L)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(N)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns the following described property located in the **COUNTY** of **WILL** :
[Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

**SEE ATTACHED LEGAL DESCRIPTION MADE A PART HERETO.**

**PIN # 23-15-28-401-030-0000**

which currently has the address of **121 WEST COBBLESTONE DRIVE**
[Street]

**CRETE** , Illinois **60417** ("Property Address"):
[City]          [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1876L3 (0011)                    *(Page 3 of 11 pages)*

MFIL3112

Form 3014 1/01

GREATLAND ▪
To Order Call: 1-800-530-9393 ☐ Fax: 616-791-1131

000495153-9

fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.    **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.    **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1876L4 (0011)                                 *(Page 4 of 11 pages)*

MFIL3112

Form 3014 1/01

GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

000495153-9

previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6.    Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7.    Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.    Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.    Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.    Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a)   Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**ILLINOIS**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM 1876L6 (0011)                    *(Page 6 of 11 pages)*

MFIL3112

**Form 3014 1/01**

GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

000495153-9

(b) **Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**ILLINOIS**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM 1876L7 (0011)                                    *(Page 7 of 11 pages)*

MFIL3112

**Form 3014 1/01**
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

000495153-9

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require

**ILLINOIS**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM 1876L8 (0011)                    *(Page 8 of 11 pages)*

**Form 3014 1/01**
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

MFIL3112                                                                 000495153-9

immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1876L10 (0011)                                           *(Page 10 of 11 pages)*

MFIL3112

Form 3014 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

000495153-9

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 11 of this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
ANTON J. SARIC                -Borrower

_____ (Seal)
GRACE A. SARIC                -Borrower

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

Witness:

_____

Witness:

_____

State of Illinois
County of

    This instrument was acknowledged before me on _____ (date) by

_____ (name[s] of person[s]).

_____
Notary Public

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1876L11 (0011)                (Page 11 of 11 pages)

MFIL3112

Form 3014 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131
000495153-9

# EXHIBIT C

# MATTON & GROSSMAN

ATTORNEYS AT LAW
200 WEST MADISON STREET
SUITE 710
CHICAGO, ILLINOIS 60606
TELEPHONE: (312) 236-9800 FACSIMILE: (312) 372-8456

January 15, 2008

**VIA CERTIFIED MAIL No.: 7005 1820 0007 0372 5733**

BankUnited FSB
1900 East Golf Road Suite 1200
Schaumberg, IL 60173

**In Re: Loan No.**

**Anton Saric**
**Grace Saric**
**121 West Cobbelstone Drive**
**Crete, IL 60417**

**Loan Number: 0045748282**

Dear Sir or Madam:

Please note that this office has been retained by Anton Saric and Grace Saric to pursue claims as they relate to violations of the Truth In Lending Act and other state and federal statutory and common law violations. As such, we are asserting an attorney's lien upon any recovery by award, settlement, judgment or otherwise related to this matter in the amount of forty percent (40%) pursuant to the Illinois Attorney Lien Act, 770 ILCS 5/1, et. seq.

Please be advised by this correspondence that, pursuant to 15 U.S.C. § 1635, Anton Saric and Grace Saric hereby rescind the above referenced loan received from June 15, 2006 because of the failure to comply with the Truth In Lending Act and its implementing regulations, including, but not limited to, 15 U.S.C. § 1635 et seq. and Regulation Z § 226.23 et seq.

Pursuant to 15 U.S.C. § 1641, demand is hereby made for the identity of the owner of this note and mortgage. We further make a claim for any and all civil penalties to the extent allowed by law. Pursuant to 12 U.S.C. § 2605, I hereby request an account history, so that I may determine what, if anything, my client is obliged to tender.

I, Sandor Grossman, under penalties as provided by 735 ILCS 5/1-109, and 28 U.S.C. § 1746, do certify that I mailed a copy of this document, to those persons delineated above via U.S. Registered mail, by enclosing a copy in a properly addressed, stamped and sealed envelope and depositing the same in the U.S. Mail at 200 W. Madison Street, Chicago, IL 60606 on January 15, 2008.

Sincerely yours,

Sandor Grossman
Attorney at Law


CC:    Client
       File

# EXHIBIT D

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Bank United
1900 East
Golf Road
Suite 1200

Schaumberg, IL 60173

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                    ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
                                   1-7

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☑ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.
4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)

7005 1820 0007 0372 5733

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

UNITED STATES POSTAL SERVICE

18 JAN 2008 PM ARL IL 600

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

- Sender: Please print your name, address, and ZIP+4 in this box •

SANDOR GROSSMAN
200 WEST MADISON
SUITE 710
CHICAGO, IL 60606

(IN RE: ANTON SKIFIC)